WILLIAMS *v.* VERONA MINING CO.

1. MASTER AND SERVANT—MINES — INSPECTION — ASSUMPTION OF RISK.

   A pumpman employed in a mine long enough to raise a presumption of acquaintance with the system under which it was worked will be deemed to have assumed the risk of having the duties of watchman performed by the shift boss.

2. SAME—FELLOW-SERVANTS — MINES — PUMPMAN AND BRAKEMAN.

   Recovery against a mine owner for the death of a pumpman in the mine cannot be based on the negligence of a brakeman having control of the hoisting machinery, they being fellow-servants.

3. SAME—PERSONAL INJURIES—NEGLIGENCE—CUSTOM — EVIDENCE —SUFFICIENCY.

   In an action against a mine owner for the death of a servant, a pumpman, evidence examined, and *held*, that there was none to show a custom of defendant of leaving its engine house and hoisting machinery without any one in charge during the hour between shifts, while pumpmen were in the mine, nor to show that the employment of a particular brakeman was such as to leave him to infer the right to leave his post of duty at such times.

Error to Gogebic; Haire, J.   Submitted April 17, 1907. (Docket No. 95.)   Decided July 1, 1907.

Case by Mary A. Williams, administratrix of the estate of John Williams, deceased, against the Verona Mining Company for the negligent killing of plaintiff's intestate.   There was judgment for defendant on a verdict directed by the court, and plaintiff brings error.   Affirmed.

*George O. Driscoll*, for appellant.

*Belmont Waples* (*Howard T. Abbott* and *Davis & Hollister*, of counsel), for appellee.

MONTGOMERY, J. This is an action to recover for injuries suffered by the plaintiff's intestate resulting in his death. The action is brought under section 10117, 3 Comp. Laws.

Plaintiff's intestate, John Williams, was employed as pumpman in the defendant's mine. The mine was a one-shaft mine, contained at that time nine levels, the ninth level being the bottom level, and was about 600 feet deep. It was about 500 feet in depth from the first to the seventh level, and about 100 feet in depth from the seventh to the ninth level. Decedent was employed on the ninth level. There was a shaft sunk from the surface to the seventh level, and at a point 200 feet or a little more in a northerly direction from the bottom of this shaft from the surface to the seventh level there was another shaft or winze sunk to the ninth level. There were ladderways in each of those shafts. The shaft which extended from the surface to the seventh level was fitted up with a skipway and skip, and was called the "skip shaft;" and the shaft which extended from the seventh to the ninth level was fitted up with a cageway and cage and was called the "cage shaft." The skip and cage were operated by means of drums in an engine house on the surface in charge of employés of defendant, called "brakemen;" the skip and cage being attached to the drums by means of cables. The cage and skip were hoisted and lowered in response to electric bell signals from the men on the surface and in the several levels of the mine, except the ninth level, at which there was no signal wire. All that a person in the mine (except at the ninth level) who wanted to be hoisted out had to do, provided there was a brakeman at the drums, was to ring a bell, and he could be hoisted out by means of the skip and cage. The ladderways mentioned were constructed of ladders about 16 feet long, one setting behind the other, and a manhole from one to the other, and there was a partition or dividing place between the ladderway and the skipway and cageway. The men who were working in

the mine sometimes rode on the cage from the seventh to the ninth level, and sometimes they "walked." The seventh level of the mine was simply a cross-cut. There was a track there on which they transferred cars from the skip shaft to the cage shaft, and it was timbered from the bottom of the skip shaft to the top of the cage shaft. The ladderway in the cage shaft was on the west side of the shaft. In order to go from the surface to the bottom of the mine, one would have to go down in the skip shaft to the seventh level, then through the cross-cut on the seventh to the top of the cage shaft, and then down the cage shaft to the ninth level or bottom of the mine, and there was no other way of getting out of the ninth level, except through the cage shaft and through the skip shaft.

Defendant was working the mine day and night shifts, and about 35 to 40 men worked on each shift. They used candles for light; the mine having no electric lights. They had air compressors for running drill machines, but none for furnishing air, and there was a down draft in the mine, so that if there was smoke on the seventh level it would descend to the ninth. It would take an ordinary man from 10 to 15 minutes to climb from the ninth to the seventh level, and about 30 minutes to climb from the seventh level to the surface of the mine on the ladders, and about 1½ or 2 minutes to pull a skip load of men from the seventh level to the surface, and about a minute to pull a load from the ninth to the seventh level. The laborers in and about the mine are denominated "miners, timbermen, pumpmen, brakemen, and machinists," and Capt. Webb had full control and management of the mine at that time. On the morning of November 5, 1901, while decedent was engaged in his duties, a fire occurred in the mine, and after the fire was extinguished the next day decedent was discovered about 15 feet from the place where the shaft leading to the ninth level intercepted the cross-cut on the seventh level, lying face down dead. It also appeared that one of the steam pipes had burst, and

there were indications that decedent had been scalded by escaping steam; but whether this was the cause of his death, or whether he was suffocated by smoke in his attempt to ascend from the ninth level, is not apparent.

The declaration contains numerous counts, but it may be said that the negligence imputed to defendant was in not having constantly at the hoisting apparatus at the surface of the mine a man in attendance, so that when signaled from below the skip could be hauled up; plaintiff's theory being that, had the brakeman been at his post of duty, the jury might properly have found that Williams could, by signaling to the brakeman, have been hoisted out of the mine and his life saved. As to the necessity of employing a watchman, it is in evidence that George Sanders, the foreman of the mining crew, was the last man out of the mine on the morning in question; that he searched the mine before he came up; that he went all over the mine; that he did this because that was his duty for the purpose of seeing that everything was all right; and that he left the mine about 5 minutes to 6. It was a small mine, 35 to 40 men working on a shift, and it appears that Sanders performed the ordinary duties that a watchman would perform, and that as a matter of fact an inspection had been made of the mine but a very few moments before the fire broke out, and that no fire was discovered. It is hardly conceivable that the decedent was not acquainted with the system under which this mine was worked, and the fair inference is that he assumed the risk arising from the absence of any other watchman and of the duties being performed by the shift boss.

The question which seemed to occasion most doubt to the circuit judge was whether the defendant was responsible for the absence of the brakeman from his post of duty on the occasion in question. It is apparently conceded, and is beyond question, that the brakeman was a fellow-servant of decedent, and that recovery cannot be based upon his negligent act. Plaintiff, however, sought to

show that it was a custom of the company to leave the engine house without a brakeman in attendance on occasions between the hours of 6 and 7 o'clock in the morning and while the pumpmen were at work in the mine.   The mine was run on two shifts; an hour intervening between the employment in the mine of the main body of workmen of each shift.   In the morning the workmen came up from the mine at 6 o'clock; the day crew taking their place at 7.   In the meantime, if timber was to be lowered into the mine, the timber crew was employed during this hour; if not, no one was employed except the brakeman in the engine house.   It was sought to show a custom of leaving the engine house without any one in charge during this hour on occasions when there was no timber to be lowered, and it was also contended that the employment of the man Hagerty, who was the brakeman on the morning in question, was such as to leave him to infer the right to leave his post of duty when no timber was to be raised.

There were two witnesses called upon this point, one Montgomery, and Hagerty, the man in charge of the engine house.   The witness Montgomery testified that the workmen who were working usually quit each morning when there was no timber, and also that he had heard the brakeman ask Capt. Webb if that was all, and that the captain told them it was, and of course they would go; but on further examination this witness testified:

"The practice was for the brakemen to work until 7 o'clock.   I couldn't say that I was ever present when the night brakemen quit before 7 o'clock in the morning.   I do not know whether there was any custom previous to the 1st day of November, 1901, at the engine house in regard to brakemen quitting when there was no timber to be lowered.   *   *   *

"*Q.* What were they referring to when they said ' was that all?'   *   *   *   What would the brakeman do then?

"*A.* Go home, I suppose.   *   *   *   He [Capt. Webb] went to work in the morning long about 7 o'clock.   It would be pretty close to that.   I didn't say I heard these conversations between Capt. Webb and the brakemen in the morning at all.   He was supposed to quit at 6 o'clock.

It would be after 6 that I heard those conversations.
* * * The custom was to stay until the hour; that is, the
man would go on at 7 o'clock and work till 6. That was
the ordinary course. They had timber to go down mostly
all the time; very seldom they didn't have timber to go
down between 6 and 7, or between 12 and 1. I couldn't
say how often that happened during the three months pre-
vious to this accident.

"Q. You couldn't say it happened at all within three
months?

"A. I couldn't say as to that. I couldn't say as to
whether or not the brakemen, sometimes, by an arrange-
ment between themselves the one who was to come on for
night shift, come on a few minutes before the regular
time to relieve his partner, or as to whether or not the
man who was to come on for the day shift came on a few
minutes earlier so as to relieve the man who had been on
the night shift. I don't know on how many occasions I
heard this conversation between the captain and the
brakemen.

"Q. There was only two classes of men that worked
in the mine 12 hours; that is, the pumpmen and the
brakemen?

"A. Well, I don't know about the timber gang how
long they worked. I understood that the pumpmen and
the brakemen worked 12 hours to the shift; that was the
general understanding—what I understood. When they
were hoisting the brakemen were always there.

"Q. Now, can you tell me on some occasion when a
brakeman left his machinery before his partner got there
to take his place?

"A. I could not.

"Q. You can't tell me that ever occurred, can you, to
be able to swear to it?

"A. No, sir, I wouldn't say that at all."

Taking the testimony of this witness as a whole, it is
clear that he is not able to testify to any case in which the
brakemen were directed or permitted to leave by the cap-
tain.

The witness Hagerty, on his direct examination, testi-
fied as follows:

"That custom was that we were to lower timber if they
wanted us to lower timber between hours, and if they

didn't it was an understanding we should go home.
\* \* \* Capt. Webb never told me I could leave there
before 7 in the morning. Nobody in authority ever told
me that. During the three months or such a matter that
I worked there before this accident to Mr. Williams, I
had not left the machinery before the opposite man on the
shift came only once. That's all I could remember of in
three months. \* \* \*

"*Q.* Are you positive there was no other occasion you
left before your partner came?

"*A.* That is when I was night shift? No, I can't re-
member. I don't remember when I was on the day shift
of any time when I left before the man who was to relieve
me came. There may have been once or twice.

"*Q.* You can't swear to that?

"*A.* I can't say that there was or wasn't.

"*Q.* And, if you did so, you had no authority from any
one who had control over the matters?

"*A.* Had no authority to leave. I took it we had au-
thority.

"*Q.* You took it so?

"*A.* Yes.

"*Q.* But Capt. Webb never told you to?

"*A.* No.

"*Q.* Nor Mr. Barber didn't?

"*A.* When Mr. Barber put me in there—

"*Q.* Let me ask you the question: Did Mr. Barber tell
you that, that you could leave before the man came on to
relieve you?

"*A.* No, he didn't put it that way. \* \* \* He said,
'You go in there,' and I was to get $2.25 a day, and I
was to stay there between hours and lower timber, if they
wanted me. That's exactly the words, as near as I can
come to them.

"*Q.* He never told you to leave there when there was
not timber to be lowered?

"*A.* No, sir.

"*Q.* You understood your regular hours were to be
there until the man came to relieve you?

"*A.* If there wasn't timber to be lowered.

"*Q.* And that was an understanding you got from what
was said?

"*A.* Yes, sir.

"*Q.* And there was no understanding what you were
to do, if there was no timber to lower, by Mr. Barber?

"*A.* No, sir; he didn't mention it.  *  *  *  The only reason for me leaving that morning was because there wasn't any timber to go down, and because of this conversation that occurred between me and the other brakeman.

"*Q.* And that's the only reason you left?

"*A.* I wasn't notified to stay there unless there was timber to go down.

"*Q.* And you took the matter in your own hands to go away without any authority or anything from anybody?

"*A.* I don't think I had any authority.  I did it without any authority.

"*Q.* And you didn't do it before.

"*A.* I don't know that I ever had a chance.  I don't know if I did have authority."

It is contended by the, plaintiff that this conversation between Mr. Barber and Mr. Hagerty was open to the construction that Hagerty was only to remain during the hour from 6 to 7 in case there was timber to be lowered. In view of the nature of his employment, and with the testimony that the shift was a 12-hour shift, and in view of the knowledge which he must have had that men were employed in this mine, and that one purpose of his attendance at this engine house was to be able to bring them up when a call was made, it is simply incredible that he could have understood that he was at liberty to leave his post of duty with these men in the mine.  His own testimony shows that he did not rely upon the conversation with Barber as a justification for leaving his post of duty, but that the only reason on that morning was because of the conversation which had occurred between him and the other brakeman.  We do not think the conversation was open to the inference that is now sought to be put upon it, and it results that there is nothing to raise an issue of fact in the case as to whether this accident occurred by reason of the default of this fellow-servant of the decedent.

The circuit judge on this ground directed a verdict for the defendant, and the judgment will be affirmed.

McALVAY, C. J., and OSTRANDER, HOOKER, and MOORE, JJ., concurred.